**Evelyn Adams, Administrator of Estate of Terry Lee Adams, Deceased, Plaintiff-Appellee, v. Brookwood Country Club, Defendant-Appellant.**

**Gen. No. 11,111.**

Second District, First Division.

February 11, 1958.

Released for publication February 28, 1958.

Lloyd P. Douglas, of Chicago, for defendant-appellant.

Leren & Burek, of Wheaton (Alexander J. Burek, of counsel) for appellee.

JUSTICE McNEAL delivered the opinion of the court.

This action was brought against the Brookwood Country Club by the Administrator of the Estate of Terry Lee Adams to recover for his wrongful death on August 29, 1954, in a creek which flowed on defendant's property. A jury trial resulted in a verdict and judgment in favor of plaintiff for $5,000 and defendant appeals.

On the pleading it was admitted that the defendant corporation then and for a long time prior thereto owned and operated the Brookwood Country Club as a golf course, and that Salt Creek coursed through the premises and adjacent properties. In substance plaintiff alleged and defendant denied that Salt Creek was shallow and narrow and known as such by persons living along it; that sometime prior to the date mentioned, defendant dredged out an area of the creek, making a pond of dangerous depth on its premises just south of the Salt Creek Forest Preserve, and constructed a wooden bridge over the pond, with two large culverts under the east terminus thereof; that the pond and bridge were visible to the public from the highway running along the premises, and the bridge and culverts were visible to the general public in the forest preserve; that defendant then and for a long time prior thereto knew that children of tender years

came upon its premises and were attracted to the pond and played there; that the condition created by defendant was visible from the highway and the preserve and aroused curiosity in children and formed an attraction for them, but defendant carelessly and negligently failed to keep minor children from coming upon its property to play in the culverts or pond or on the bridge; and that plaintiff's intestate, nine years of age, was then in the exercise of due care for one of his age, but by means of defendant's negligence was induced by childish curiosity to enter on the premises in the vicinity of the pond, and while there was injured and by reason thereof died by drowning.

Plaintiff also alleged and defendant denied that intestate's death was the proximate result of defendant's negligence and carelessness, in one or more of the following ways: (a) defendant maintained an attractive nuisance without any restraint to deter children from entering on its premises, (b) defendant created and maintained this attractive nuisance in an area visible to the public from a public highway and from the forest preserve, (c) defendant had knowledge or should have known that children of tender years habitually came upon the premises and were attracted to the pond, had ample notice and opportunity to observe this custom of minor children, and failed to restrain or deter such children from going on its premises, and (d) defendant's agent or employee stationed at the pond failed to restrain intestate from going to and upon the premises and into the pond, knowing the danger to the child from going into deep water. Defendant contends that as a matter of law, defendant was not guilty of any negligence and no act of the defendant was the proximate cause of the boy's death, and that the trial court should have directed a verdict in favor of defendant or entered judgment for defendant notwithstanding the verdict.

The evidence discloses that Salt Creek flowed in a southerly direction through the Salt Creek Forest Preserve for about three city blocks, and then through defendant's golf course. The forest preserve was bounded on the west by Addison Road, and to the south defendant's property extended along both sides of the road for a couple of blocks. Just south of the north line of the golf course, a service road extended east from Addison and over a bridge across the creek. There were private property and no trespassing signs facing the preserve along the service road. Some distance north of the country club there was an entrance from Addison Road into the forest preserve. From this entrance a path extended east to a foot bridge over the creek, and then southerly along the east bank of the creek toward the golf course. At one time there had been a barbed wire fence between the preserve and defendant's property, but on the day of the accident the fence was down and only remnants remained. In this vicinity the creek was not over hip boot in depth and twenty-five to thirty feet in width with two to three and a half foot banks. The banks of the creek were in a natural wild state in the forest preserve. Through the golf course the banks had been cleared and landscaped, but nothing had been done to change the natural course or depth of the creek.

On Sunday, August 29, 1954, Richard Wojnaiowski, also aged nine, visited at the home of Terry Lee Adams until about noon and then went home to eat. Thereafter Richard returned to Terry's home, and about 3:00 P. M., they started out on their bicycles with the intention to swim in the forest preserve. They entered the preserve from Addison Road at the entrance mentioned, rode east on the path and over the foot bridge, and then went south on the path along the creek to a point near the south line of the forest preserve where they had to stop. They undressed,

placed their clothes near the path, and went in the creek on the preserve. They went across the creek to the west bank and returned to the east bank. The water was up to Richard's waist at that point. They played on a pipe of the Texas-Oklahoma Gas line, which extended from bank to bank and above the water of the creek in the forest preserve. Some fishermen came near, so the boys got out of the water and put on their clothes. As soon as the fishermen left, the boys took off their clothes and went back into the creek. Under the approach to the east end of the service bridge there were two 36-inch culverts located to divert flood waters east of the bridge abutment. The north end of these culverts and the north side of the bridge were just a few feet south of defendant's north line. The boys were swimming for some time after they took their clothes off the second time. Then they went through the culverts, came back through the culverts, and returned to the creek. They went under the service bridge and kept walking downstream. Richard saw three boys on top of the bridge. When he last saw Terry the water was about up to his chest. He didn't see Terry go down. Richard went under, but he swam out, saw the same three boys, and went home. Terry's clothing was found in the forest preserve near the gas pipe line. His body was pulled out of the creek on defendant's property fifty or sixty feet south of the service bridge. It was stipulated that Terry died about 3:30 P. M. from drowning.

The evidence also discloses that the forest preserve was normally crowded with picnickers on Saturdays and Sundays, but Richard testified that he had never been in the preserve or where the accident occurred, before that afternoon. A boy aged fifteen testified that he had caddied twice at this club and that he identified Terry after he had been pulled out of the water. This witness had gone from the preserve to

the golf course first in 1951 or 1952 and a couple of times in 1954. He had waded in the creek to retrieve golf balls and sold them to the players, but the employees of the club would chase him away if they saw him, because they had their own ball hawk. Another boy aged seventeen testified that he was employed as a caddy during the summer of 1954, and that he saw two ball hawks pull Terry out of the creek. The evidence does not reveal the identity of the three boys on the bridge or what they were doing there. It may be that they were the ball hawks who pulled Terry out of the stream. Ball hawks were not employees of the club but operated under an exclusive arrangement with the club professional whereby they waded the length of the creek in hip boots and retrieved golf balls for fifteen or twenty-five cents each, with the duty and privilege of chasing other boys away from their territory.

█ When Terry Lee Adams was drowned, the courts seemed to be of one mind in holding that a canal, pond or other open body of water was not of itself an attractive nuisance. Mindeman v. Sanitary District, 317 Ill. 529, 533; Peers v. Pierre, 336 Ill. App. 134, 139; Wood v. Consumers Co., 334 Ill. App. 530, 541; Baker v. Fruin-Colnon Contracting Co., 271 Ill. App. 300, 305; Kelly v. First Bank & Trust Co., 256 Ill. App. 439, 441; 8 A.L.R.2d 1254, 1263. An analysis of the decisions in which a body of water was held to be an attractive nuisance shows that in each there was some artificial feature other than the mere water and its location rendering the place particularly attractive and dangerous to children, such as the floating logs and planks in City of Pekin v. McMahon, 154 Ill. 141, 150, the board walk in Howard v. City of Rockford, 270 Ill. App. 155, 162; the appearance of a path on the thick scum which had accumulated on the water in Cicero State Bank v. Dolese & Shepard Co., 298 Ill.

App. 290, 293; the floating and partially frozen five-gallon drum, the tree stumps and bottles in Gustafson v. Consumers Sales Agency, 414 Ill. 235, 250, and the barrels, cans, bottles, tubs, sticks, Christmas trees, and other items seen through and frozen in the ice in City National Bank of Kankakee v. City of Kankakee, 15 Ill.App.2d 458, 146 N.E.2d 381.

In Kahn v. James Burton Co., 5 Ill.2d 614, 622, a contractor had possession and control of property in a populous community, on which lumber had been piled. A boy was injured when the pile of lumber gave way and fell on him. In concluding that it was for the jury to decide whether the conditions created by defendants amounted to an attractive nuisance, the court said: "The creator of certain conditions dangerous and hazardous to children because of their immature appreciation of such dangers and hazards must be held to a certain standard of conduct for the protection of such children in accordance with the attendant circumstances and conditions. . . . In certain cases referred to as 'attractive nuisance' cases the courts point out that the infant, because of his immature judgment and inability to appreciate certain conditions, was attracted and allured to certain premises and therefore is no longer a trespasser but is to be regarded as an invitee. . . . Another class of cases deals with watercourses, ponds and lakes. Yet liability has been sustained in these cases where it appears that the water caused the drowning. The courts then declare that the water in itself cannot be the attraction for a case of liability but that other objects must have attracted the children. It has been ruled that the complaint must allege such attractive objects as floating logs, rafts, boardwalks, tree stumps, bottles, containers, etc., even though the injury or death complained of was not in the least occasioned by the attracting objects. In view of the foregoing conflict and the fact

269

that, as many courts have declared, a child in his youthful imagination and ingenuity can make a plaything of almost anything and is attracted by almost everything, the only proper basis for decision in such cases dealing with personal injuries to children are the customary rules of ordinary negligence cases."

In its opinion in the Kahn case the court said (p. 625) that where the owner or person in possession knows, or should know, that young children habitually frequent the vicinity of a defective structure or dangerous agency existing on the land, which is likely to cause injury to them because they, by reason of their immaturity, are incapable of appreciating the risk involved, and where the expense or inconvenience of remedying the condition is slight compared to the risk to the children, such owner or other person in possession and control of the premises has a duty to exercise due care to remedy the condition or otherwise protect the children from injury resulting from it; and that "the element of attraction is significant only in so far as it indicates that the trespass should be anticipated, the true basis of liability being the foreseeability of harm to the child."

There is no evidence in this record that defendant ever dredged out an area of the creek and made a pond of dangerous depth on its premises, as alleged. Witnesses who testified concerning the depth of the creek on defendant's property said that the water was hip boot deep or up to Terry's chest. No one testified that the water was of any greater depth. It was stipulated that Terry drowned, but there is no evidence upon which the jury could have concluded that the drowning was probably caused by dangerous depth of the water. Nor is there any evidence that the creek and defendant's bridge and culverts were visible from Addison Road or any public highway, or that defendant knew that children of tender years came upon its premises

and were attracted to any pond and played there, or that defendant stationed any agent or employee at any pond, as alleged. There is no evidence that Terry Lee Adams had ever been to the forest preserve or on defendant's premises prior to the accident, and no evidence that anyone other than Terry and his companion, Richard, ever went swimming in the creek on defendant's premises before this accident. On the contrary Richard testified that he had never been to the preserve or on defendant's property before the day in question. There is no evidence upon which the jury could have found that defendant knew or should have known that children of tender years habitually came upon its premises and were attracted to any pond there, or that defendant should have anticipated and foreseen that a child might come upon its property and sustain injury there.

The stream in which Terry Lee Adams drowned was an ordinary, natural watercourse. There was nothing unusual, exceptional or peculiar about it. The water on defendant's property was the same as that which flowed through the forest preserve, where Terry and his companion first went swimming in the creek. It was just as attractive and dangerous as any other natural stream but not more so. Removal of the brush and landscaping the area along the banks of the creek through the golf course made the water no more dangerous, and probably made the creek less attractive to swimmers in the nude, than it was before the brush was removed or as it ran through the preserve. The course and depth of this stream were created by nature, not by the defendant, and depended upon the volume of subterranean and surface waters which accumulated in Salt Creek upstream from the golf course. Defendant had no control over the elements which produced the quantity of water flowing over its northern boundary, had no right as against upper and

271

lower riparian owners to interfere with the natural flow of the stream, and had done nothing to change the natural course or depth of the creek.

Plaintiff urges that the culvert under the east approach to defendant's bridge attracted the boys to defendant's premises and that the attractive nuisance was the culvert, not the creek. According to the evidence the boys left Terry's home with the predetermined intention to swim in the forest preserve. After they swam in the preserve and played on the gas pipe line which led them into and over the creek, the boys explored defendant's culvert which attracted them out of and away from the water in the creek. The culvert did not directly or indirectly injure either of them. Then the boys abandoned the entertainment afforded by the culvert and returned to the creek, went under the bridge and kept walking downstream, and Terry drowned. His exploration in and through the culvert was merely incidental to his swimming in the creek and contributed in no way to cause his death. Like the retaining wall from which the deceased slipped into the canal, in Ellison v. Commonwealth Edison Co., 351 Ill. App. 58, 65, the culvert was not a proximate cause of Terry Lee Adams' death by drowning.

In the Kahn opinion the court referred to cases dealing with watercourses, ponds and lakes, but we do not believe that the court intended to overrule its earlier decisions that liability cannot be predicated upon a body of water where there is no unusual danger. In that opinion the court considered the fact that the expense of remedying the dangerous condition involved in the lumber pile was slight compared to the risk to children. To require riparian owners along all the rivers and creeks flowing in and adjacent to Illinois to construct boy-proof fences or to employ guards to protect children and restrain them from coming upon their lands adjacent to such streams would im-

pose upon such owners no slight expense, but a most oppressive and unbearable burden. The number of boys who drown in comparison to the total number who visit natural ponds and streams to fish or swim is comparatively small.

 Under the authorities applicable here, we are of the opinion that there is no evidence in this record tending to show that defendant either created or maintained an attractive nuisance or was guilty of any negligence which proximately caused the death of plaintiff's intestate, and that the verdict in favor of the plaintiff is contrary to the evidence. The trial court should have directed a verdict for the defendant. The judgment of the Circuit Court of Du Page county is, therefore, reversed.

Reversed.

DOVE, P. J. and SPIVEY, J., concur.